IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    *v.*<br><br>HEATHER COTE | Criminal Action No.<br><br>1:12-CR-0053-SCJ-RGV |

**GOVERNMENT'S POSTHEARING BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

The United States of America, by Sally Quillian Yates, United States Attorney, and Nathan P. Kitchens, Assistant United States Attorney for the Northern District of Georgia, files this posthearing brief in opposition to Defendant Heather Cote's motion to suppress evidence.

Cote's motion to suppress evidence obtained in an overseas investigation fails because she cannot prove that German authorities were acting as agents of the FBI. Although the FBI and German authorities cooperated in their investigations and exchanged information, mere coordination is not sufficient to establish that the German authorities were agents of American law enforcement when the FBI did not request or plan the search of Cote's residence in Germany, was not present during the search, and did not otherwise participate in the search. Accordingly, Cote's motion to suppress evidence seized in Germany should be denied.

1. **Procedural History**

On February 14, 2012, a Northern District of Georgia grand jury returned a 16-count indictment against Lawrence Kenneth Swenson, Jr. and Heather Cote charging them with wire fraud, conspiracy to commit wire fraud, and transportation of stolen money and property. (Doc. 1.) On May 21, 2013, Cote filed a motion to suppress statements, and she perfected the motion to suppress statements in two motions filed on June 11 and 12, 2013. (Docs. 46, 50, 51.)[1] On October 11, 2013, Cote filed a motion to suppress evidence seized at her residence in Germany by German investigators. (Doc. 63). On July 30, 2014, an evidentiary hearing was held on the motion to suppress evidence. (Doc. 71.)

2. **Statement of Facts**

In January 2011, Special Agent Steve Ryskoski of the FBI-Atlanta Field Office initiated an investigation of Cote and Swenson based on their suspected involvement in an advance fee scheme. (Doc. 75 at 96:22–24.) The FBI was aware that Cote and Swenson resided in Germany, but the FBI had

---

[1] The Government agreed that it would not affirmatively introduce Cote's statements to German investigators in December 2011 and January 2012, or statements Cote provided in February 2012, in its case-in-chief at trial, with the caveat that the Government reserves the right to introduce the statements (1) in any proceeding in which Cote introduces another statement made during the same discussion or (2) in cross-examination of Cote, should she provide testimony inconsistent to her prior statements. (Doc. 75 at 4:14–5:6.) Based on the Government's agreement, the parties agreed that Cote's motions to suppress statements are moot. (Id. at 5:7–9.)

no contact with German investigators about Cote and Swenson before October 2011. (Id. at 97:13–18.)

In October 2011, FBI Special Agent Richard Tamplin was serving as the assistant legal attaché for criminal matters in Berlin, Germany. (Id. at 7:6–25.) In that role, Agent Tamplin serves as a liaison between American law enforcement and German law enforcement agencies, including the Niedersachsen, or LKA. (Id. at 8:3–9:11.)

In early October 2011, Agent Norbert Brilla of the LKA called Agent Tamplin to discuss a pending German investigation of money laundering involving Cote and Swenson. (Id. at 9:2–10:1.) Agent Brilla reported that German authorities initiated a money laundering investigation based on reports of suspicious activity by German casinos, and he asked Agent Tamplin if the FBI had any knowledge of Cote and Swenson. (Id. at 9:19–10:12.) At the time Agent Brilla contacted Agent Tamplin, there was a pending LKA investigation and a pending criminal prosecutive investigation in Hannover, Germany regarding potential violations of German law—both German investigations started independently of the FBI based on information received from German casinos. (Id. at 10:19–23, 19:16–20:11.) Based on LKA's request, Agent Tamplin determined from FBI indices that the FBI had a pending investigation of Cote and Swenson, and he contacted the Atlanta Field Office of the FBI to inform them of the German investigation. (Id. at 11:18–12:23.)

On October 12, 2011, Agent Brilla provided a copy of the interim German investigative report of Cote and Swenson and stated that he "intend[s] to jointly coordinate the further course of action." (Gov't Ex. 1A). Agent Tamplin and Agent Ryskoski understood this to mean that German authorities wanted information from the United States regarding the source of the funds subject to the German money laundering investigation, and German agents would provide information to the FBI about where the money went overseas. (Doc. 75 at 18:7–19:5, 99:5–19.) The LKA interim report stated that "it is the intention of the prosecuting attorney's office of Hannover Germany with respect to accused Swenson, Amy Swenson, and Heather Cote, to issue search warrants, seizure warrants." (Id. at 21:7–12; Gov't Ex. 1A at 4.2.) The interim report was dated September 8, 2011, approximately a month before the LKA learned about the FBI investigation, and German prosecutors "had already determined this would be their action" prior to contacting the FBI. (Doc. 75 at 23:3–15, 24:9–14, 65:25–66:8.) Based on the interim report, the FBI realized that the "German authorities were a lot further in their investigation than we were," and that the Germans were "ready to go" with a search prior to any United States knowledge of the German investigation. (Id. at 100:5–102:7.)

On October 13, 2011, Agent Tamplin provided the FBI-Atlanta office with a summary of the German interim investigative report, in which he explained that German investigators hoped to coordinate investigations with the FBI and anticipated executing search warrants. (Id. at 27:15–28:16;

4

Gov't Ex. 2.) Agent Tamplin explained that German investigators wanted to "consult with the U.S. now that they [were] aware that we have a pending investigation" because they "didn't want to act precipitously and negatively impact the U.S. investigation" by making their investigation overt through the execution of search warrants. (Doc. 75 at 28:18–29:21.) German investigators did not expect the FBI to participate in the search, and the German prosecutor would need to make the decision about whether to seek a search warrant. (Id. at 29:22–30:3.) In response, the FBI-Atlanta office provided Agent Tamplin with a summary of their investigation to distribute to the LKA. (Id. at 31:4–14, 102:11–25.)

On October 31, 2011, Agent Tamplin met with the German investigators and prosecutor in Hannover, Germany to discuss the German and FBI investigations. (Id. at 32:22–33:12.) During the meeting, Agent Tamplin and the German investigators agreed that because both the subjects and victims appeared to be United States citizens, prosecution "would be best suited for the United States." (Id. at 34:4–18.)[2] The German investigators agreed that they would delay their planned search warrants with the intention that the FBI would serve American arrest warrants prior to the execution of

---

[2] Agent Tamplin explained that this issue was important to resolve early because the German principle of double jeopardy differs from United States law: if German authorities prosecuted Swenson and Cote for money laundering, "they would not extradite the subject to the U.S. for prosecution of the same individuals [for] the same crime but on different charges." (Id. at 35:3–16.)

German search warrants to lessen the risk of flight. (Id. at 35:18–36:10, 38:7–13.) The parties agreed that the FBI would not obtain any evidence seized pursuant to the German search warrants until the United States issued a Mutual Legal Assistance Treaty ("MLAT") request. (Id. at 36:14–23.) Agent Ryskoski later joined the meeting by teleconference, and the Germans again agreed to delay their planned search until the United States indicted Cote and Swenson. (Id. at 103:13–104:10.)[3] The FBI made no request that German investigators conduct searches, nor did the FBI provide instructions for what German agents should search. (Id. at 36:11–18, 39:1–3, 105:19–106:8.) Despite deferring prosecution to the United States, the German authorities maintained an "ongoing investigation" of Cote and Swenson and "conducted investigation independent of us." (Id. at 74:14–75:1, 125:16–126:1.)

In the following weeks, German investigators grew "concerned that funds [were] being dissipated" by Swenson and inquired about the status of the FBI investigation. (Id. at 42:23–43:5.) LKA Agent Brilla told Agent Tamplin that the German agents "would like to move sooner rather than later in hopes of recovering some funds for the victims." (Gov't Ex. 5.) German investigators told Agent Tamplin that they "wanted to freeze the accounts before funds were fully dissipated and conduct, execute search warrants as they had stated and was there [*sic*] intention in the summary

---

[3] This teleconference was the FBI case agent's only direct contact with German authorities. (Id. at 106:12–17.)

report. But again they were being courteous of the U.S. interests . . . . They didn't want to do it prematurely." (Doc. 75 at 43:17–24.) Agent Ryskoski discussed with Agent Tamplin that the FBI did not want the German authorities to execute search warrants before an indictment "because our fear was if [Cote and Swenson] knew they were being looked at by us, the FBI here or the German authorities, Mr. Swenson would take off or Ms. Cote would take off." (Id. at 109:20–110:3.)

On December 16, 2011, Agent Tamplin sent an e-mail to Agent Ryskoski and Supervisory Agent Paul Fike in Atlanta; Martin Busch, a Department of Justice ("DOJ") attorney responsible for extradition matters with Germany; a DOJ paralegal, and German investigators with an update on the German investigation. (Id. at 45:4–18; Gov't Ex. 6.)  Special Agent Ryskoski previously had informed Agent Tamplin that he did not anticipate an indictment in the United States before January 19, 2012, "which obviously was not consistent with the German plans and intentions that they had to move forward with these funds." (Doc. 75 at 48:9–15.) Based on this timeline, the German prosecutor told Agent Tamplin that he "felt like he could no longer honor his commitment with respect to Northern District of Georgia allowing him to proceed, that he has to go forward because he felt—he didn't feel right in letting those funds be dissipated, that he would have to act independently." (Id. at 47:3–10.) In the e-mail following his discussion with the German prosecutor, Agent Tamplin listed as a "recommendation" that "German authorities execute

7

search warrants at locations known to them and freeze/seize identified assets based upon their investigation." (Gov't Ex. 6.) Agent Tamplin explained that, while he listed this as a "recommendation," he considered this action by German authorities to be a "fait accompli" and did not provide any recommendation to German authorities to proceed with the search. (Doc. 75 at 49:10–50:12.) In fact, Agent Tamplin understood that the FBI-Atlanta office "preferred that the searches not be executed until there was an arrest warrant in place," but the German prosecutor indicated that he would no longer wait on United States authorities. (Id. at 50:15–51:5.)

On December 20, 2012, LKA Agent Brilla told Agent Tamplin that the LKA had executed search warrants at Cote's residence. (Id. at 52:3–53:12; Gov't Ex. 7.) Neither Agent Tamplin nor Agent Ryskoski knew about the planned date for the search by German authorities, nor did they have input as to when, where, or how the search was to be executed. (Id. at 51:19–23, 112:25–113:3.) Agent Tamplin did not have any role in drafting or editing the German search warrant required for the search, nor did he see it. (Id. at 61:16–62:3, 92:22–93:14.) Agent Tamplin had no conversations with German authorities while the search was being conducted, and no United States agent was a participant in or present during the search. (Id. at 55:1–10, 112:13–24.)

The FBI did not receive any of the materials taken in the search until October 2010, more than ten months after the German search, when the German prosecutor received a July 2012MLAT request from the United

8

States. (Id. at 57:9–58:1, 118:9–21.) The German investigation continued after the search in 2012 as German authorities identified additional victims and requested that the FBI-Atlanta office conduct interviews in support of the German investigation. (Id. at 58:2–10.)

### 3. Argument

Cote's motion attempts to transform customary information-sharing and cooperation between sovereigns into an impermissible effort to circumvent the Fourth Amendment. Cote's claim is meritless because the mere fact that the FBI and German authorities exchanged information, and that the FBI later obtained evidence seized by German agents, did not turn the LKA into agents of American law enforcement. German investigators decided to conduct searches in furtherance of their independent investigation, controlled the planning and execution of the searches, and did not include any FBI agent in the search. Accordingly, Cote's motion to suppress evidence should be denied.

### A. Cote Bears the Burden of Proof in Establishing That German Investigators Acted as Agents of the FBI.

"Evidence obtained by foreign police officers from searches carried out in their own countries is generally admissible in American courts regardless of whether the search complied with the Fourth Amendment." United States v. Rosenthal, 793 F.2d 1214, 1230–31 (11th Cir. 1986). Courts do not apply the Fourth Amendment exclusionary rule to searches by foreign authorities on foreign soil because of the "doubtful deterrent effect

on foreign police practices that will follow from a punitive exclusion of the evidence in question by an American court." United States v. Morrow, 537 F.2d 120, 139 (5th Cir. 1976).[4] But there are two exceptions to this rule: the exclusionary rule applies "(1) if the foreign officers' conduct 'shocks the conscience of the American court'[5] and (2) if 'American officials participated in the foreign . . . interrogation, or if the foreign authorities were acting as agents for their American counterparts,' also known as the joint venture doctrine." United States v. Frank, 599 F.3d 1221, 1228–29 (11th Cir. 2010) (quoting United States v. Heller, 625 F.2d 594, 599 (5th Cir. 1980)); see also Rosenthal, 793 F.2d at 1231 ("Fourth Amendment rights are generally inapplicable to an action by a foreign sovereign in its own territory in enforcing its own laws, even though American officials are present and cooperate in some degree.").

---

[4] The decisions of the former Fifth Circuit before October 1, 1981 are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

[5] Cote does not argue that the search by German authorities "shocks the conscience," nor is there any evidentiary support for such a contention. See United States v. Emmanuel, 565 F.3d 1324, 1331 (11th Cir. 2009) (noting that "[t]he 'shocks the judicial conscience' standard is meant to protect against conduct that violates fundamental international norms of decency"); United States v. Angulo-Hurtado, 165 F. Supp. 2d 1363, 1370 n.7 (N.D. Ga. 2001) ("Even if Defendants were to advance the argument that Colombia's conduct was so shocking as to invalidate the search, the law is clear that far more appalling abuses, such as torture, must be shown to satisfy this narrow exception.").

The defendant bears the burden to establish the joint venture doctrine exception. See United States v. Angulo-Hurtado, 165 F. Supp. 2d 1363, 1371 (N.D. Ga. 2011) ("The 'joint venture' doctrine is a purposefully limited exception, and this Circuit accordingly has set a high threshold for a defendant to invoke it."); see also Frank, 599 F.3d at 1229 (rejecting joint venture doctrine when defendant provided "no evidence that the [foreign] officers acted as agents of the United States"); United States v. Valdivia, 680 F.3d 33, 52 (1st Cir. 2012) (denying defendant's Fourth Amendment claim when evidence of involvement of American agents in foreign investigation was "not sufficient to support an application of the joint venture exception"). Courts have "as a statistical matter been virtually unanimous in rejecting claims of" the joint venture doctrine. Morrow, 537 F.2d at 140. In fact, the Government has not found any Eleventh Circuit precedent holding that the Fourth Amendment applied to foreign searches pursuant to the exception.

> **B. Cote Cannot Prove that German Investigators Were Agents of the FBI When German Investigators Pursued Search Warrants in Their Independent Investigation and No American Agents Planned or Participated in the Searches.**

Cote contends that the joint venture doctrine applies to the search of her residence by LKA agents in Germany because the FBI and LKA exchanged information about their investigations, German agents conducted the search after agreeing to defer prosecution to the United States, and the FBI later obtained evidence seized in the search for use in its investigation.

These facts are plainly insufficient to prove that the LKA was acting as an agent of the FBI in conducting the search, and Cote cites no authority supporting her position.

Mere information-sharing between American and foreign law enforcement does not trigger application of the joint venture doctrine. See United States v. Gecas, 120 F.3d 1419, 1433–34 (11th Cir. 1997) (rejecting joint venture doctrine when United States law enforcement shared files with foreign governments because "[t]his type of intergovernmental cooperation . . . does not render the requesting government an agent of the United States"). To the contrary, "[n]ormal lines of communication between the law enforcement agencies of different countries are beneficial without question and are to be encouraged." Morrow, 537 F.2d at 140 (affirming admission of evidence seized by Canadian agents, even though FBI provided tip that initiated Canadian investigation). Here, German authorities developed their investigation of Cote independently of any American law enforcement source based on information provided by German casinos. (Doc. 75 at 10:19–23, 19:16–20:11.) Neither German agents nor the FBI had any knowledge of the corresponding investigations in each country until LKA Agent Brilla contacted Agent Tamplin in October 2011. (Id. at 9:19–10:12, 97:13–18.) Before any information was exchanged, the FBI had been investigating Cote and Swenson for roughly nine months, and German authorities were "ready to go" with their plan to execute search warrants in support of the German investigation. (Id. at 23:3–15, 24:9–14,

65:25–66:8, 96:22–24, 100:5–102:7.) In light of the LKA's intention to execute a search warrant of Cote's residence <u>before</u> learning about any American investigation, Cote cannot establish that the FBI's information-sharing led to the German search. <u>Cf.</u> <u>Heller</u>, 625 F.2d at 600 (concluding that British officers were not acting as American agents in arresting and interrogating American suspect when participation of American law enforcement was "peripheral at most," even though American official provided tip that led to arrest). Although Cote notes that the FBI and LKA discussed working on their investigations "jointly," Def. Br. at 9, the FBI understood this to mean that German and American authorities would exchange information about the source of Swenson's illicit funds and the money flow after the funds transferred to German accounts. (Doc. 75 at 18:7–19:5, 99:5–19.) Such routine information-sharing between law enforcement agencies should be "encouraged," and it does not subject foreign agents to American constitutional law. <u>Morrow</u>, 537 F.2d at 140.

    Although the FBI learned about the LKA's plan to execute search warrants a month before the search, the Eleventh Circuit has held that the joint venture doctrine does not apply even when American agents had much more substantial involvement in foreign searches. <u>See, e.g.</u>, <u>United States v. Rosenthal</u>, 793 F.2d 1214, 1230–31 (11th Cir. 1986) (affirming denial of motion to suppress evidence despite finding that American agents helped plan raid of the defendant's residence in Colombia and were present during search). In <u>United States v. Behety</u>, 32 F.3d 503, 506–07 (11th

Cir. 1994), the defendant sought to suppress evidence seized by Guatemalan agents aboard his yacht when DEA agents tipped off Guatemalan agents about the yacht's arrival and plans to export cocaine, DEA agents were present during the search and videotaped the search, and DEA agents transported the defendants and seized cocaine to the United States for prosecution. The Eleventh Circuit concluded that the district court properly denied the motion to suppress based on the joint venture doctrine because the "DEA agents' presence and even videotaping of the search does not constitute the level of participation this exception contemplates." Id. at 511.

At most, the record here supports an argument that the FBI knew about and acquiesced in the German plan to execute search warrants at Cote's residence. The FBI did not request that German agents conduct searches of Cote's residence,[6] nor was it necessary to do so when the LKA indicated in its September 2011 interim report, a month before any contact with the FBI, that they intended to execute search warrants at Cote's residence. (Doc. 75

---

[6] Cote points to a December 16, 2011 e-mail from Agent Tamplin as recommending that German agents execute search warrants. Def. Br. at 10. During his testimony about this e-mail, Agent Tamplin explained that he considered the German plan to execute searches to be a "fait accompli" and did not provide any recommendation to German authorities to proceed with the search. (Doc. 75 at 49:10–50:12.) In the same "recommendation" section, the December 16, 2011 e-mail states that "[p]erhaps Swenson/Cote won't flee when they are not immediately arrested concurrent with the execution of the search warrants," which plainly is also not a recommendation. (Gov't Ex. 6.)

14

at 36:11–18, 39:1–3, 105:19–106:8; Gov't Ex. 1A at 4.2.) American agents did not know the planned date for the search, did not participate in planning how or where the search was to be executed, and were not present during the search. (Doc. 75 at 51:19–23, 55:1–10, 112:13–113:3.) In fact, the FBI preferred that German authorities not conduct the search in December 2011 because they feared it would cause Cote or Swenson to flee, but German authorities decided to proceed based on their own timeline in their investigation. (Id. at 50:15–51:5, 109:20–110:3.) The FBI's acquiescence to the planned searches does not render the LKA an implicit agent of the United States.

 Nor does the fact that German authorities agreed to defer prosecution to the United States satisfy the joint venture doctrine. The charging decisions of foreign and American prosecutors have little bearing on whether foreign authorities are agents of American law enforcement. See Behety, 32 F.3d at 507, 511 (holding that joint venture doctrine did not apply even when Guatemalan authorities told DEA agent "that they wanted the [defendants] to be prosecuted in the United States" and transferred custody of evidence and defendants to United States). "A number of factors may properly inform the decision of prosecutorial venue among different sovereign states," and the LKA's decision to defer prosecution to the DOJ does not establish that the FBI directed the German search when German authorities had a preexisting plan to execute search warrants in their investigation. United States v. Getto, 729 F.3d 221, 232 (2d Cir. 2013) (affirming denial of

motion to suppress evidence after "declin[ing] to infer that the decision to prosecute defendant in the United States, without more, indicates that American law enforcement directed the preceding investigation abroad). This is particularly true here when the German investigation continued after the search, and German authorities continued to seek assistance from the FBI-Atlanta office in support of the German investigation. (Doc. 75 at 58:2–10.)

Finally, the fact that the FBI obtained evidence seized in the German search pursuant to an MLAT request ten months later does not establish that German authorities were agents of American law enforcement. See Morrow, 537 F.2d at 139–40 (rejecting joint venture doctrine when Canadian officials conducted warrantless raid and turned over evidence seized to FBI); Stonehill v. United States, 405 F.2d 738, 746 (9th Cir. 1968) (denying suppression of evidence obtained from search in Philippines when (1) "the raids were instigated and planned by Philippine officers before United States agents became involved"; (2) there was no involvement of American agents during the raids; (3) American agents were only given access to evidence seized after the raids; (4) American agents requested that the raids be postponed; and (5) American agents, in providing information to Philippine counterparts, did not request any search by Philippine authorities); see also Gecas, 120 F.3d at 1434 (drawing parallel between "[m]ere delivery of [defendant's] file to a foreign government" with extradition, "another example of international

cooperation," which does not subject foreign authorities to constitutional scrutiny in American courts). An MLAT request subsequent to a search, particularly one as far removed as the July 2012 request here, does not transform foreign authorities into American agents by their mere agreement to provide assistance to a United States investigation.

In short, Cote cannot prove that German authorities were acting as agents of American law enforcement when the LKA initiated an independent investigation and planned to search Cote's residence before any FBI contact, the FBI never requested a search, the FBI did not participate in the planning or execution of the search itself, and the LKA conducted the search despite FBI requests that any search be postponed. Accordingly, the Fourth Amendment does not apply to the German search of Cote's residence.

## Conclusion

For the foregoing reasons, the United States respectfully requests that the Court DENY Cote's motion to suppress evidence seized overseas. (Doc. 63.)

> Respectfully submitted,
>
> SALLY QUILLIAN YATES
> *United States Attorney*
>
>
> /s/NATHAN P. KITCHENS
>   *Assistant United States Attorney*
> Georgia Bar No. 263930

600 U.S. Courthouse
75 Spring St. SW
Atlanta, GA 30303
404-581-6000
nathan.kitchens@usdoj.gov

## Certificate of Service

I served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Page A. Pate
The Pate Law Firm, LLC
101 Marietta Street, Suite 3300
Atlanta, GA 30303

September 30, 2014

/s/ NATHAN P. KITCHENS

NATHAN P. KITCHENS

*Assistant United States Attorney*