IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL CASE NO. 1:12-cr-00053-SCJ-RGV |
| HEATHER COTE | |

**MAGISTRATE JUDGE'S REPORT, RECOMMENDATION,
AND ORDER ON DEFENDANT'S PRETRIAL MOTIONS**

Defendant Heather Cote ("Cote") is charged along with co-defendant Lawrence Kenneth Swenson, Jr. ("Swenson"), in a sixteen-count indictment with conspiracy, wire fraud, and transportation of stolen money and property in connection with an alleged advance fee scheme. [Doc. 1].[1] Cote has moved to suppress evidence seized at her residence in Germany, [Doc. 63], and following an evidentiary hearing held on July 30, 2014,[2] the parties filed post-hearing briefs, [Docs. 77 & 79]. For the reasons that follow, it is **RECOMMENDED** that Cote's motion to suppress evidence, [Docs. 63], be **DENIED**.

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] See [Doc. 75] for the transcript of the evidentiary hearing. Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Doc. 75 at ___)." In addition, the parties submitted exhibits which will be referred to as "(Gov't Ex. ___)" for the government's exhibits and "(Def. Ex. ___)" for Cote's exhibits.

## I.  STATEMENT OF FACTS

In January 2011, Special Agent Stephen Ryskoski ("Agent Ryskoski") of the Federal Bureau of Investigation ("FBI") Atlanta Field Office initiated an investigation of Cote and Swenson based on their suspected involvement in an advance fee scheme.  (Doc. 75 at 96-97).  In October 2011, FBI Special Agent Richard Tamplin ("Agent Tamplin") was serving as the assistant legal attaché for criminal matters in Berlin, Germany.  (Id. at 7).  In that role, Agent Tamplin served as a liaison between American law enforcement and German law enforcement agencies, including the Niedersachsen, or Landeskriminalamt ("LKA").  (Id. at 8-9).  In early October 2011, Agent Norbert Brilla ("Agent Brilla") of the LKA called Agent Tamplin to discuss a pending German investigation of alleged money laundering involving Cote and Swenson.  (Id. at 9–10).  Agent Brilla reported that German authorities initiated a money laundering investigation based on reports of suspicious activity by German casinos, and he asked Agent Tamplin if the FBI had any knowledge of Cote and Swenson.  (Id.).  At the time Agent Brilla contacted Agent Tamplin, there was a pending LKA investigation and a pending criminal prosecutive investigation in Hannover, Germany regarding potential violations of German law—both German investigations started independently of the FBI based on information received from German casinos.  (Id. at 10, 19).  Based on LKA's

request, Agent Tamplin determined from FBI indices that the FBI had a pending investigation of Cote and Swenson, and he contacted the FBI-Atlanta Field Office to inform them of the German investigation. (Id. at 11-12).

On October 13, 2011, Agent Brilla provided Agent Tamplin a copy of the interim German investigation report of Cote and Swenson and stated that he "intend[s] to jointly coordinate the further course of action." (Gov't Ex. 1A). Agents Tamplin and Ryskoski understood this to mean that German authorities wanted information from the United States regarding the source of the funds subject to the German money laundering investigation, and German agents would provide information to the FBI about where the money went overseas. (Doc. 75 at 18-19, 99). The LKA interim report, dated September 8, 2011, approximately one month before the LKA learned about the FBI investigation, stated that "it is the intention of the prosecuting attorney's office of Hannover Germany with respect to accused Swenson, Amy Swenson and Heather Cote, to issue search warrants, seizure warrants." (Id. at 21; Gov't Ex. 1A at 4.2). Based on this report, Agent Ryskoski realized that "the German authorities were a lot further in their investigation" and "were ready to go" with search and seizure warrants prior to contacting the FBI. (Doc. 75 at 100-01).

3

On the same day that he received the German interim investigation report, Agent Tamplin provided a summary of it to the FBI-Atlanta Field Office and explained that German investigators hoped to coordinate investigations with the FBI and anticipated executing search warrants. (Id. at 25-28; Gov't Ex. 2). Agent Tamplin further explained that the German investigators wanted "to consult with the U.S. now that they [were] aware that [the FBI had] a pending investigation" because they did not "want to act precipitously and negatively impact the U.S. investigation" by making their investigation overt through the execution of search warrants. (Doc. 75 at 28-29). German investigators did not expect the FBI to participate in the search, and the German prosecutor would need to make the decision about whether to seek a search warrant. (Id. at 29-30). In response, the FBI-Atlanta Field Office provided Agent Tamplin a summary of their own investigation to forward to the LKA. (Id. at 31, 102).

On October 31, 2011, Agent Tamplin met with the German investigators and prosecutors in Hannover, Germany, and they all agreed that prosecution "would be best suited for the United States" because both the subjects and victims were United States citizens. (Id. at 32-34). The German investigators initially elected to wait until the FBI secured arrest warrants before executing their planned search warrants in

order to lessen the risk of flight.  (Id. at 35-36, 38).  Agent Ryskoski later joined the meeting by teleconference, and the Germans again agreed to delay their planned search until the United States indicted Cote and Swenson.  (Id. at 103-04).  The FBI did not request that German investigators conduct searches or provide instructions for what German agents should search.  (Id. at 36, 39, 105-06).  Moreover, the FBI would not receive any evidence seized pursuant to the German search warrants until the United States had issued a Mutual Legal Assistance Treaty ("MLAT") request.  (Id. at 36).  Despite deferring prosecution to the United States, the German authorities maintained an "ongoing investigation" of Cote and Swenson and "conducted investigation independent of [the FBI.]"  (Id. at 74-75, 125-26).

Sometime later, the German investigators grew "concerned that funds [were] being dissipated" by Swenson and inquired about the status of the FBI investigation. (Id. at 42-44).  LKA Agent Brilla told Agent Tamplin that the Germans "would like to move sooner rather than later in hopes of recovering some funds for the victims." (Gov't Ex. 5).  Agent Tamplin testified that the Germans

> wanted to freeze the accounts before funds were fully dissipated and conduct, execute search warrants as they had stated . . . was [their] intention in the summary report.  But again they were being courteous of the U.S. interests, because we had indicated that we would proceed with the prosecution.  They didn't want to do it prematurely[.]

(Doc. 75 at 43). Agent Ryskoski discussed with Agent Tamplin that the FBI did not want German authorities to conduct searches before a U.S. indictment "because our fear was if [Cote and Swenson] knew they were being looked at by . . . the FBI . . . or the German authorities, [they] would take off[.]" (Id. at 109-110).

On December 16, 2011, Agent Tamplin sent an email regarding the status of the German investigation to Agent Ryskoski; Supervisory Special Agent Paul Fike in Atlanta; Martin Busch, a Department of Justice ("DOJ") attorney responsible for extradition matters with Germany; a DOJ paralegal; and German investigators. (Id. at 45; Gov't Ex. 6). Agent Ryskoski previously had advised Agent Tamplin that he "did not anticipate an indictment prior to January 19th, [2012], which obviously was not consistent with the German plans and intentions that they had to move forward with these funds." (Doc. 75 at 48). Based on this timeline, the German prosecutor told Agent Tamplin that he

> felt like he could no longer honor his commitment with respect to Northern District of Georgia allowing him to proceed, that he has to go forward because he felt – he didn't feel right in letting those funds be dissipated, that he would have to act independently.

(Id. at 47). In the December 16th email following his discussion with the German prosecutor, Agent Tamplin listed as a "recommendation" that "German authorities execute search warrants at locations known to them and freeze/seize identified assets based upon their investigation[.]" (Gov't Ex. 6). Agent Tamplin explained

6

that, while he listed this as a "recommendation," he considered this action by German authorities to be a "fait accompli" and did not provide any recommendation to German authorities to proceed with the searches. (Doc. 75 at 49-50). In fact, Agent Tamplin understood that the FBI-Atlanta Field Office "preferred that the searches not be executed until there was an arrest warrant in place," but the German prosecutor had indicated that he would no longer wait on United States authorities. (Id. at 50-51).

On December 20, 2011, Agent Tamplin learned that the German investigators had executed search warrants at Cote's and Swenson's residences. (Id. at 52-53; Gov't Ex. 7). Neither Agent Tamplin nor Agent Ryskoski knew in advance the specific date of the searches by German authorities, nor did they have any input as to when or how the searches would be conducted. (Doc. 75 at 51, 112-13). Agent Tamplin did not have any role in drafting or editing the German search warrants, nor did he ever see any search warrant. (Id. at 61-62, 92-93). Agent Tamplin had no conversation with any German investigator while the searches were being conducted, and no United States agents participated or were present during the searches. (Id. at 55, 112).

The FBI did not receive any of the materials taken in the searches until October 2012, more than ten months after the German searches, upon the German

prosecutor's receipt of a July 2012 MLAT request from the United States. (Id. at 57-58, 118). The German investigation continued after the searches, as German authorities identified additional victims and requested that the FBI-Atlanta Field Office "conduct interviews on behalf of [the Germans'] investigation." (Id. at 58).

## II. DISCUSSION

Cote moves to suppress evidence seized from her residence in Germany by German investigators.[3] [Doc. 63]. Cote argues in her post-hearing brief that the German authorities acted as agents of the FBI and that the searches were unreasonable under the Fourth Amendment. [Doc. 77 at 8-12]. In support of her argument that the Germans were acting as agents of the FBI, Cote points to the following: (1) the countries agreed to "jointly coordinate" their investigations and share information; (2) the German authorities agreed to defer prosecution to the United States and to delay execution of the search warrants until the United States obtained indictments; and (3) the evidence seized during the German searches was provided to the FBI for prosecution in the United States. [Id. at 9-10]. The government contends that Cote cannot meet her burden to show that the German

---

[3] Cote previously moved to suppress statements. [Docs. 46, 50, & 51]. However, at the beginning of the evidentiary hearing, the government agreed not to make affirmative use in its case in chief of the statements that were the subject of Cote's motions, but reserved the right to use them for impeachment. (Doc. 75 at 4-5). Accordingly, the parties agreed that Cote's motions to suppress statements were moot. (Id. at 5).

investigators were agents of the FBI because mere coordination of the countries' investigations is insufficient and because no United States agents planned or participated in the searches. [Doc. 79 at 11-17].

Generally, "evidence obtained from searches carried out by foreign officials in their own countries is admissible in United States courts, even if the search would not otherwise comply with United States law or the law of the foreign country." United States v. Emmanuel, 565 F.3d 1324, 1330 (11th Cir. 2009) (footnote and citations omitted). One exception to this general rule is that "evidence from foreign searches is subject to the exclusionary rule if American law enforcement officials substantially participated in the search or if the foreign officials conducting the search were actually acting as agents for their American counterparts." Id. (citation omitted). This exception is known as the "joint venture doctrine." United States v. Frank, 599 F.3d 1221, 1228-29 (11th Cir. 2010) (citations omitted). It "is a purposefully limited exception, and this Circuit accordingly has set a high threshold for a defendant to invoke it." United States v. Angulo-Hurtado, 165 F. Supp. 2d 1363, 1371 (N.D. Ga. 2001).[4]

---

[4] Another exception, not argued here, "is that evidence from foreign searches is inadmissible if the conduct of the foreign officials during the search 'shocks the judicial conscience.'" Emmanuel, 565 F.3d at 1330.

In this case, German authorities initiated a money laundering investigation of Cote independently of the FBI based on reports of suspicious activity by German casinos. (Doc. 75 at 9-10, 19-20). Neither the German investigators nor the FBI were aware of one another's investigations until LKA Agent Brilla contacted Agent Tamplin in October 2011. (Id. at 9-10, 97). Before any information was exchanged, the FBI had been investigating Cote and Swenson for nine months, and German authorities "were ready to go" with search and seizure warrants in support of their own money laundering investigation. (Id. at 23-24, 65-66, 96, 100). Although the FBI and the LKA discussed "jointly" coordinating their investigations, Agents Tamplin and Ryskoski understood this to mean that the German and American authorities would exchange information about the source of the illicit funds and the money flow after the funds were transferred to German accounts. (Id. at 18-19, 99). Moreover, while German and American authorities continued to communicate about their respective investigations, and the Germans agreed to defer prosecution of Cote and Swenson to the United States and initially delayed executing search warrants in Germany until arrest warrants were secured by the FBI, the Germans ultimately executed their search warrants on their own timing after there was a delay in obtaining the arrest warrants in the Northern District of Georgia. (Doc. 75 at 50-53). The fact that the LKA and the FBI were sharing information with one another about

their investigations is insufficient to trigger application of the joint venture exception. See United Sates v. Gecas, 120 F.3d 1419, 1434 (11th Cir. 1997) (citations omitted) ("[I]ntergovernmental cooperation . . . does not render the [foreign government] an agent of the United States."); United States v. Morrow, 537 F.2d 120, 140 (5th Cir. 1976) ("Normal lines of communication between the law enforcement agencies of different countries are beneficial without question and are to be encouraged.").[5]

Although the FBI knew about and acquiesced in the German plan to execute search and seizure warrants,[6] no United States agents knew the planned date of the searches, participated in the searches, had any input as to when or how the searches

---

[5] Decisions of the former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[6] Although Agent Tamplin's December 16, 2011, email listed as a "recommendation" that German authorities proceed with the search and seizure warrants, Agent Tamplin explained that the German plan to do so was a "fait accompli" and that he did not provide any recommendation to German authorities to proceed with the searches. (Doc. 75 at 49-50; Gov't Ex. 6). Rather, Agent Tamplin was directing his remarks to the American investigators since the Germans were going to proceed with their searches even though there were no arrest warrants in place in the Northern District of Georgia. (Doc. 75 at 50). This explanation is supported by the email's third listed "recommendation" that "[p]erhaps Swenson/Cote won't flee when they are not immediately arrested concurrent with the execution of the search warrants," which was not a recommendation, but an expression of his frustration over the delay in obtaining arrest warrants in the Northern District of Georgia. (Doc. 75 at 51; Gov't Ex. 6).

would be conducted, or were present during the searches. (Doc. 75 at 51, 55, 112-13). In fact, the FBI preferred that German authorities not conduct the searches before an indictment was obtained because they feared it would cause Cote and/or Swenson to flee, but German authorities decided to proceed based on their own timeline. (Id. at 50-51, 109-10). The FBI's acquiescence in the planned searches does not render the LKA an implicit agent of the United States, as the Eleventh Circuit has held that the joint venture exception did not apply even when United States law enforcement had much more substantial involvement in foreign searches. See United States v. Behety, 32 F.3d 503, 506-07, 511 (11th Cir. 1994) (finding that the joint venture exception did not apply where Drug Enforcement Administration ("DEA") agents tipped off Guatemalan agents about the arrival of defendants' yacht and their plans to export cocaine, DEA agents were present during the search and videotaped it, and DEA agents transported defendants and the seized cocaine to the United States for prosecution); United States v. Rosenthal, 793 F.2d 1214, 1230-31 (11th Cir. 1986) (affirming denial of motion to suppress evidence where American officers helped plan raid of defendant's Columbian residence and were present during the search).

The fact that German authorities, who had a preexisting investigation and plan to execute search warrants, agreed to defer prosecution to the United States also does not satisfy the joint venture doctrine. See Behety, 32 F.3d at 507, 511 (holding

that joint venture doctrine did not apply even when Guatemalan authorities told a DEA agent "that they wanted the [defendants] to be prosecuted in the United States" and transferred custody of the evidence and defendants to the United States); see also United States v. Getto, 729 F.3d 221, 232 (2d Cir. 2013) ("[W]e do not find particularly significant the fact that the defendant—an American citizen, whose victims were primarily American citizens—was arrested and charged in the United States, rather than charged in Israel. A number of factors may properly inform the decision of prosecutorial venue among different sovereign states . . . . We decline to infer that the decision to prosecute defendant in the United States, without more, indicates that American law enforcement directed the preceding investigation abroad.").

Lastly, that the FBI obtained evidence seized in the German search pursuant to an MLAT request ten months later does not establish that the German authorities acted as agents of the FBI. See Morrow, 537 F.3d at 139-40 (rejecting joint venture doctrine when Canadian officials conducted warrantless raid and turned over evidence seized to the FBI); United States v. Stonehill, 405 F.2d 738, 746 (9th Cir. 1968) (affirming denial of motion to suppress evidence seized in Philippines where (1) "the raids were instigated and planned by Philippine officers before United States agents became involved"; (2) American agents were not involved during the

raids; (3) American agents were only allowed access to the seized evidence after the raids; (4) American agents objected to the raids and asked that they be postponed; and (5) American agents, in providing information to Philippine officers, did not request any search by Philippine authorities); see also Gecas, 120 F.3d at 1434 (citations omitted) ("Mere delivery of [defendant's] file to a foreign government" with extradition is "another example of international cooperation" and does not subject foreign authorities to constitutional scrutiny in American courts.).

In sum, Cote has not met her burden to show that German authorities acted as agents of the FBI when conducting the search of her residence in Germany. The German authorities initiated an independent investigation and planned to search Cote's residence before they were aware of the FBI investigation. The FBI did not request a search, participate in the planning or execution of the search, and the LKA conducted the search despite FBI requests to postpone it. Accordingly, the joint venture doctrine does not apply here, and Cote's motion to suppress is due to be denied.

### III. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Cote's motion to suppress, [Doc. 63], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 6th day of November, 2014.

/s/ Russell G. Vineyard
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE